**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| BRIAN S. S., | ) | NO. CV 19-515-E |
| Plaintiff, | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| ANDREW SAUL, Commissioner of Social Security, | ) | **AND ORDER OF REMAND** |
| Defendant. | ) | |

Pursuant to sentence four of 42 U.S.C. section 405(g), IT IS HEREBY ORDERED that Plaintiff's and Defendant's motions for summary judgment are denied, and this matter is remanded for further administrative action consistent with this Opinion.

**PROCEEDINGS**

Plaintiff filed a Complaint on January 23, 2019, seeking review of the Commissioner's denial of disability benefits. The parties filed a consent to proceed before a United States Magistrate Judge on March 19, 2019.

Plaintiff filed a motion for summary judgment on July 5, 2019. Defendant filed a motion for summary judgment on July 25, 2019. The Court has taken both motions under submission without oral argument. See L.R. 7-15; "Order," filed January 25, 2019.

**BACKGROUND**

Plaintiff, a former maintenance technician, asserts disability since January 9, 2015, based on alleged physical and mental impairments (Administrative Record ("A.R.") 34-42, 187, 209, 215, 288). The alleged mental impairments include "anxiety, memory loss, hearing voices, trouble sleeping and nightmares" for which Plaintiff takes Sertraline HCL (Zoloft), Zolpidem Tartrate (Ambien) and Quetiapine Fumarate (Seroquel). (Id.).

Dr. Lawrence Ogbechie, a psychiatrist who began treating Plaintiff in February of 2015, diagnosed major depressive disorder, recurrent, with stressors including the shooting death of Plaintiff's son in 2009 and the wartime deaths in Cambodia of Plaintiff's mother, brother and two sisters (A.R. 325, 328). In a "Mental Disorder Questionnaire Form" dated July 13, 2015, Dr. Ogbechie opined that Plaintiff has: (1) "limited capacity to interact with others," due to his limited communication skills and his desire to be alone and not to talk to people; (2) poor concentration, inability to "sustain focused [sic] in a period of time," but the ability to complete simple household routines with some help and to follow simple oral instructions with "some difficulty"; and (3) "fair to poor" adaptability to stresses common to everyday life (A.R. 326-28). Dr.

Ogbechie assigned a Global Assessment of Functioning ("GAF") score of 55,[1] and gave Plaintiff a "guarded" prognosis (A.R. 328).

In August and November of 2015, non-examining state agency review physicians considered some of the medical records (including Dr. Ogbechie's treatment notes and opinions) (A.R. 69-72, 81-85). The state agency physicians opined that Plaintiff has severe affective and anxiety disorders and, due to his difficulty with focus and sustaining concentration, has moderate limitations in his ability to: (1) carry out detailed instructions; (2) maintain attention and concentration for extended periods; (3) work in coordination with or in proximity to others without being distracted by them; (4) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (5) interact appropriately with the general public; (6) accept instructions and respond appropriately to criticism from supervisors; and (7) respond to changes in the work setting (A.R. 69-72, 81-85). The physicians opined that Plaintiff retains the ability to perform "simple repetitive tasks" requiring no more than "<u>minimal or superficial interaction with others</u>." <u>See</u> A.R. 69, 72, 84-85 (reportedly giving "weight" to Dr. Ogbechie's opinions) (emphasis added); <u>but see</u> A.R. 70, 83 (claiming, "There is no indication that there is medical or other opinion evidence [to

---

[1] <u>See</u> American Psychological Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 34 (4th ed. 2000). A GAF of 51-60 indicates "[m]oderate symptoms (<u>e.g.</u>, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (<u>e.g.</u>, temporarily falling behind in schoolwork)." <u>Id.</u>

weigh].").

The Administrative Law Judge ("ALJ") found that Plaintiff has a "severe" major depressive disorder, but retains the residual functional capacity for work at all exertion levels limited to "simple, routine and repetitive tasks, with <u>no more than frequent interaction with public and coworkers</u>" (A.R. 16, 18-19, 21 (giving only "partial weight" to Dr. Ogbechie's July, 2015 opinions and to the state agency physicians' opinions)) (emphasis added). The ALJ found that a person with this residual functional capacity could perform jobs existing in significant numbers in the national economy (A.R. 23 (referencing vocational expert testimony at 55-60)). The Appeals Council denied review (A.R. 1-3).

**STANDARD OF REVIEW**

Under 42 U.S.C. section 405(g), this Court reviews the Administration's decision to determine if: (1) the Administration's findings are supported by substantial evidence; and (2) the Administration used correct legal standards. See Carmickle v. Commissioner, 533 F.3d 1155, 1159 (9th Cir. 2008); Hoopai v. Astrue, 499 F.3d 1071, 1074 (9th Cir. 2007). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (citation and quotations omitted); see Widmark v. Barnhart, 454 F.3d 1063, 1067 (9th Cir. 2006).
///
///

> If the evidence can support either outcome, the court may not substitute its judgment for that of the ALJ. But the Commissioner's decision cannot be affirmed simply by isolating a specific quantum of supporting evidence. Rather, a court must consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [administrative] conclusion.

Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citations and quotations omitted).

**DISCUSSION**

Plaintiff asserts that the ALJ erred in connection with the assessment of Plaintiff's mental residual functional capacity. For the reasons discussed herein, the Court agrees.

**I.  Summary of the Relevant Medical Record**

Dr. Ogbechie treated Plaintiff monthly from February of 2015 through at least December of 2017 (A.R. 335-45, 348-51, 370-77, 413-42). Plaintiff initially complained of increased anxiety and nervousness, occasional panic attacks, occasional mood swings, frustration, "too much thinking," and poor sleep (A.R. 335). Plaintiff reported that, although his son had been shot and killed in 2009, Plaintiff had been seeing visions of his son (A.R. 335). Plaintiff reportedly had a history of depression since 2009, with generalized weakness, no energy, trouble sleeping, poor concentration,

poor memory, fatigue, loss of appetite, loss of interest in daily activities, nightmares, forgetfulness and inability to focus (A.R. 335). On examination, Plaintiff reportedly was oriented, pleasant, cooperative and coherent, with depressed vegetative signs present and "fair" memory, concentration, insight and judgment (A.R. 335). Dr. Ogbechie diagnosed major depressive disorder, recurrent, assigned a GAF score of 55, and prescribed Trazodone HCL and Zoloft (A.R. 335-36). Except as otherwise indicated below, throughout Dr. Ogbechie's treatment, Plaintiff's reported examination results and assigned GAF scores remained unchanged from this first visit, and his medications were continued. See A.R. 338-45, 348-51, 370-77, 413-42.

In March of 2015, Plaintiff reported that he was depressed and could not sleep (A.R. 337). Dr. Ogbechie increased Plaintiff's Trazodone (A.R. 337). In April of 2015, Plaintiff reported that he was feeling down, frustrated, hopeless and helpless (A.R. 338-39). In May of 2015, Plaintiff reported poor concentration, frustration, and right shoulder pain (A.R. 340). In June of 2015, Dr. Ogbechie added a prescription for Ambien (A.R. 341).

Plaintiff returned later in June of 2015, complaining of nightmares (A.R. 342). In July of 2015, Dr. Ogbechie completed a Mental Disorder Questionnaire Form (summarized above) (A.R. 324-28, 343-44). In August of 2015, Plaintiff reported nightmares and feeling "alone and sad," but "denie[d] any harm to self or others" (A.R. 345). In September of 2015, Plaintiff reported that he remained "alone and sad" (A.R. 349-51). In November of 2015, Plaintiff again complained of nightmares (A.R. 370).

In December of 2015, Plaintiff reported that people were knocking on his door at night, he was tired and he was seeing and talking to his deceased son (A.R. 371). He was prescribed Seroquel (A.R. 371). In January of 2016, Plaintiff reported that he feared being hurt by someone and he continued to see things and hear voices (A.R. 372-73).

In February of 2016, Plaintiff returned with the same complaints (A.R. 374). In March of 2016, Plaintiff reported seeing things, hearing voices, fearing being hurt by someone, and feeling sad, depressed and lonely (A.R. 375). In May of 2016, Plaintiff reported that he could not sleep, had fatigue, felt depressed, was "alone and sad," and that he continued to see things, hear voices and fear someone would hurt him (A.R. 377). In June of 2016, Plaintiff reported worry, anxiety, thinking too much, difficulty sleeping, and said he continued to see things, hear voices and fear someone would hurt him (A.R. 442).

In July of 2016, Plaintiff sought a "certificate of disability," reporting that he continued to see things, hear voices and fear someone would hurt him (A.R. 441). Examination results were unchanged, except for specific notations that Plaintiff "admits to perceptual disturbances" and "delusional ideations" (A.R. 441). Dr. Ogbechie diagnosed major depressive disorder, recurrent, severe, with psychotic features (A.R. 441).

In August of 2016, Plaintiff reported that he was fatigued, depressed, sad and lonely, had trouble sleeping and poor concentration, and he said he continued to see things, hear voices and

fear someone would hurt him (A.R. 439). In September of 2016, Plaintiff reported that he was worried, sad, depressed and fatigued (A.R. 437). He also said he had poor concentration and trouble sleeping (A.R. 437). In October of 2016, Plaintiff returned, and his medications were continued (A.R. 435-36).

In November of 2016, Plaintiff reported that he continued to see things, hear voices and fear someone would hurt him (A.R. 433). In January of 2017, Plaintiff reported that he had trouble sleeping, he was recently divorced, and he was worried, sad and depressed (A.R. 431). In February of 2017, Plaintiff reported that he was worried, sad, depressed, had trouble sleeping and he continued to see things, hear voices and fear someone would hurt him (A.R. 429). In March of 2017, Plaintiff reported he was sad, depressed, thinking too much, having anxiety, worrying and having trouble sleeping (A.R. 427). Plaintiff also said he continued to see things, hear voices and fear someone would hurt him (A.R. 427).

In April of 2017, Plaintiff reported fatigue, anthralgia, poor concentration, worry, sadness, depression, thinking too much, and inability to sleep (A.R. 425). Plaintiff also said he continued to see things, hear voices and fear someone would hurt him (A.R. 425). In May of 2017, Dr. Ogbechie doubled Plaintiff's Seroquel dose (A.R. 424). In June of 2017, Plaintiff reported trouble sleeping, nightmares, flashbacks, worry, sadness and depression (A.R. 422).

In July of 2017, Plaintiff reported no new complaints and said he was "doing well with the prescribed medication," but also said that

his "[p]revious symptoms still exist" (A.R. 420). In August of 2017, Plaintiff gave a similar report (A.R. 417). In October of 2017, Plaintiff again reported that he was "doing well with the prescribed medication" and said he was "feeling better," but Plaintiff also said he was hearing voices and having nightmares and disturbed sleep (A.R. 413). Dr. Ogbechie added a diagnosis of PTSD and continued Plaintiff's medications (A.R. 413).[2]

In November of 2017, Plaintiff reported no new complaints and said he was "doing well with the prescribed medication," but also said that his prior symptoms still existed (A.R. 415). Dr. Ogbechie prepared an "Evaluation Form for Mental Disorders" dated November 11, 2017 (A.R. 461-64). Therein, Dr. Ogbechie explained Plaintiff's illness as follows:

> The patient was initially seen on 02-16-2015, complaining of being tired [from] people knocking on his door at night due to the killing of his son, that [sic] was gunned down 6 years ago. He stated that[] he has poor sleep, think[s] too much, depression, generalized weakness[,] no energy, nightmares and bad dreams, loss of interest in daily life activities, poor concentration and memory, cannot focus and forgets a lot.

///

---

[2] Dr. Ogbechie completed a "Certificate of Disability" form dated October 7, 2017, certifying that Plaintiff would be disabled from October 7, 2017 through October 7, 2018 based on his depression (A.R. 440).

9

(A.R. 461). Plaintiff, who was from Cambodia, reported that his mother, brother and two sisters were killed in front of Plaintiff during a war, and Plaintiff also said that his son had been gunned down in 2009 after Plaintiff's wife left him (A.R. 461).

On examination, Plaintiff reportedly was calm, cooperative and displayed "unworthy behavior," admitted to having poor concentration, inability to focus and easy disruption, poor memory, forgetfulness, thinking too much and loss of interest in activities (A.R. 462). Plaintiff reportedly appeared sad and anxious, and Plaintiff stated that he is depressed with low energy, but without suicidal or homicidal thoughts (A.R. 462). Plaintiff admitted hearing voices and seeing his dead son in front of him as well as in his dreams (A.R. 462). Plaintiff reportedly was able to help with simple housework, cook simple foods "sometimes with some help" and care for himself "with some motivation" (A.R. 463). Due to his multiple traumatic experiences, Plaintiff reportedly wanted to stay alone and not talk to anyone (A.R. 463). According to Dr. Ogbechie, Plaintiff's concentration is poor, Plaintiff has limited ability to sustain focused attention and is easily disrupted, and Plaintiff is able to follow simple oral instructions "but sometimes with difficulty" (A.R. 463). Dr. Ogbechie characterized Plaintiff's "adaptability" to a work-like environment as "fair to poor" (A.R. 463). Plaintiff then was taking Ambien, Seroquel and Zoloft (A.R. 464). Dr. Ogbechie diagnosed major depressive disorder, recurrent, severe, with a GAF of 55, and a "guarded" prognosis (A.R. 464).
///
///

Dr. Ogbechie also provided a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)" dated December 2, 2017 (prior to the administrative hearing) (A.R. 458-60). Based on Plaintiff's depression screening test and Mini-Mental Status Examination ("MMSE"), Dr. Ogbechie indicated that Plaintiff has "marked" limitations in his ability to make judgments on complex work-related decisions, and "moderate" limitations in his ability to understand, remember and carry out detailed instructions, make judgments on simple work-related decisions, and <u>interact appropriately with the public, supervisors and coworkers</u> (A.R. 458-60 (emphasis added); see also A.R. 465-66 (MMSE test reporting score of 23 out of 30 suggesting, at most, "mild" cognitive impairment, and depression screening test reporting score of 18 suggesting "moderately severe depression")). Dr. Ogbechie also reported that Plaintiff has decreased concentration and memory and is forgetful and unable to focus (A.R. 459).

**II. Substantial Evidence Does Not Support the ALJ's Mental Residual Functional Capacity Assessment, and the ALJ Erred in the Evaluation of the Medical Opinion Evidence.**

On the present record, the ALJ's assessment of Plaintiff's mental limitations is not supported by substantial evidence. As summarized above, the state agency physicians gave "weight" to Dr. Ogbechie's opinions, and Dr. Ogbechie opined that Plaintiff has significantly greater mental limitations than the ALJ found to exist. The Administration did not utilize the services of any consultative examining physician. Thus, the ALJ's assessment of Plaintiff's mental limitations (as supposedly permitting "frequent interaction" with the

11

public and with coworkers) is unsupported by any expert medical opinion.

The ALJ appears to have relied on her own non-medical lay opinion to define Plaintiff's functional capacity. An ALJ cannot properly rely on the ALJ's own lay knowledge to make medical interpretations of examination results or to determine the severity of medically determinable impairments. See Tackett v. Apfel, 180 F.3d 1094, 1102-03 (9th Cir. 1999); Balsamo v. Chater, 142 F.3d 75, 81 (2d Cir. 1998) (an "ALJ cannot arbitrarily substitute his [or her] own judgment for competent medical opinion") (internal quotation and citation omitted); Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996) ("ALJs must not succumb to the temptation to play doctor and make their own independent medical findings"); Day v. Weinberger, 522 F.2d 1154, 1156 (9th Cir. 1975) (an ALJ is forbidden from making his or her own medical assessment beyond that demonstrated by the record). Absent expert medical assistance, the ALJ could not competently translate the medical evidence in this case into a mental residual functional capacity assessment. See Tackett v. Apfel, 180 F.3d at 1102-03 (ALJ's residual functional capacity assessment cannot stand in the absence of evidentiary support).

Rather than making her own lay assessment of Plaintiff's mental limitations, the ALJ should have ordered an examination and evaluation of Plaintiff by a consultative mental health specialist. See Day v. Weinberger, 522 F.2d at 1156; see also Reed v. Massanari, 270 F.3d 838, 843 (9th Cir. 2001) (where available medical evidence is insufficient to determine the severity of the claimant's impairment,

the ALJ should order a consultative examination by a specialist); accord Kish v. Colvin, 552 Fed. App'x 650 (2014); see generally Mayes v. Massanari, 276 F.3d 453, 459-60 (9th Cir. 2001) (ALJ's duty to develop the record further is triggered "when there is ambiguous evidence or when the record is inadequate to allow for the proper evaluation of the evidence") (citation omitted); Brown v. Heckler, 713 F.2d 441, 443 (9th Cir. 1983) ("[T]he ALJ has a special duty to fully and fairly develop the record to assure the claimant's interests are considered. This duty exists even when the claimant is represented by counsel.").

The ALJ also erred with respect to the ALJ's evaluation of Dr. Ogbechie's July, 2015 opinion. The ALJ discounted this opinion as supposedly not supported by: (1) Dr. Ogbechie's treatment notes, which assertedly showed that Plaintiff was "doing well with medications" and that "mental status examinations were within normal limits" (A.R. 21); and (2) Plaintiff's admitted ability to "drive to appointments and pharmacy" (A.R. 21).[3]

Generally, a treating physician's conclusions "must be given substantial weight." Embrey v. Bowen, 849 F.2d 418, 422 (9th Cir. 1988); see Rodriguez v. Bowen, 876 F.2d 759, 762 (9th Cir. 1989) ("the ALJ must give sufficient weight to the subjective aspects of a

---

[3] The ALJ also rejected the state agency physicians' limitation of Plaintiff to "minimal interactions with others" as "over-exaggerated in light of the medical evidence" (A.R. 21). According to the ALJ, "[e]valuations show[ed] that [Plaintiff] was always pleasant, cooperative, and coherent and denied any thoughts of harm or danger to self or others" (A.R. 21).

doctor's opinion. . . .  This is especially true when the opinion is that of a treating physician") (citation omitted); see also Garrison v. Colvin, 759 F.3d 995, 1012 (9th Cir. 2014) (discussing deference owed to the opinions of treating and examining physicians).  Even where the treating physician's opinions are contradicted, "if the ALJ wishes to disregard the opinion[s] of the treating physician he . . . must make findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record." Winans v. Bowen, 853 F.2d 643, 647 (9th Cir. 1987) (citation, quotations and brackets omitted); see Rodriguez v. Bowen, 876 F.2d at 762 ("The ALJ may disregard the treating physician's opinion, but only by setting forth specific, legitimate reasons for doing so, and this decision must itself be based on substantial evidence") (citation and quotations omitted).  Rejection of an uncontradicted opinion of a treating physician, as arguably applicable here, requires a statement of "clear and convincing" reasons.  Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996); Gallant v. Heckler, 753 F.2d 1450, 1454 (9th Cir. 1984).  Here, the ALJ's stated reasons for discounting Dr. Ogbechie's opinions are insufficient under either standard.

    An ALJ sometimes may properly reject a treating physician's opinion where the opinion is not adequately supported by the physician's treatment notes or objective clinical findings.  See Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) (ALJ may reject a treating physician's opinion that is inconsistent with other medical evidence, including the physician's treatment notes); Connett v. Barnhart, 340 F.3d 871, 875 (9th Cir. 2003) (treating physician's opinion properly rejected where physician's treatment notes "provide

no basis for the functional restrictions he opined should be imposed on [the claimant]"); see also 20 C.F.R. §§ 404.1527(c), 416.927(c) (factors to consider in weighing treating source opinion include the supportability of the opinion by medical signs and laboratory findings as well as the opinion's consistency with the record as a whole).

In the present case, however, no physician discerned any inconsistency between Dr. Ogbechie's opinions and his notes or any other part of the medical record. The state agency physicians reviewed and gave weight to Dr. Ogbechie's opinions available at the time of their review (A.R. 69, 72, 84-85). As detailed above, Dr. Ogbechie's notes consistently report that Plaintiff presented with "depressed vegetative signs," which no physician characterized as "within normal limits" (as the ALJ purported to conclude). The ALJ also did not discuss Dr. Ogbechie's detailed December, 2017 medical source statement, or the accompanying evaluation form, MMSE and depression questionnaire (A.R. 20-21; see also A.R. 458-66). Additionally, although there were some treatment notes beginning in July of 2017 indicating that Plaintiff was "doing well with his medication," all of those notes also indicate that Plaintiff's symptoms, including Plaintiff's delusional symptoms, continued despite medication (A.R. 413, 415, 417, 420). In light of this record, the ALJ's lay discernment of any claimed inconsistency between the Dr. Ogbechie's treatment notes and Dr. Ogbechie's medical opinions cannot constitute substantial evidence. See Balsamo v. Chater, 142 F.3d at 81; Rohan v. Chater, 98 F.3d at 970; Day v. Weinberger, 522 F.2d at 1156.

///

Furthermore, while inconsistencies between a treating physician's opinions and a claimant's admitted daily activities sometimes can furnish a sufficient reason for rejecting a treating physician's opinions, see, e.g., Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001), Plaintiff's admitted activities are not inconsistent with Dr. Ogbechie's opinions. Those activities consist of sleeping most of the day and driving no more than three times a month to doctors' appointments and to the pharmacy (see A.R. 33-34, 44-46). These scant activities do not provide a legitimate basis for discounting Dr. Ogbechie's opinions.

Defendant suggests as a ground for discounting Dr. Ogbechie's opinions the asserted fact that Dr. Ogbechie relied on Plaintiff's "properly discounted" subjective complaints. See Defendant's Motion, pp. 6-7. The ALJ did not expressly invoke Dr. Ogbechie's alleged reliance on Plaintiff's subjective complaints as a ground for discounting Dr. Ogbechie's opinions (A.R. 20-21). Therefore, this Court cannot affirm the ALJ's discounting of Dr. Ogbechie's opinions on this ground. See Pinto v. Massanari, 249 F.3d 840, 847 (9th Cir.2001) (court "cannot affirm the decision of an agency on a ground that the agency did not invoke in making its decision").

Defendant also argues that the ALJ's failure to limit Plaintiff's residual functional capacity to preclude more than "minimal or superficial" contact with others is harmless in light of the vocational expert's testimony. See Defendant's Motion, pp. 7-8. The vocational expert initially testified that, if a person were limited to simple, routine tasks and "occasional" contact with the public,

co-workers and supervisors, or, alternatively, to no contact with the public and "occasional superficial" contact with co-workers, that person could perform jobs as an automation machine attendant, hand packager and laundry worker (A.R. 55-57).[4]  The vocational expert testified that the Dictionary of Occupational Titles does not address contact with co-workers or supervisors but, based on her experience, the identified jobs "generally . . . [work] with things or objects, and so there's not . . . constant contact with other people" (A.R. 56).  On further questioning, however, the vocational expert admitted that the jobs identified probably would require "more than occasional" contact with supervisors during training (A.R. 59).  When asked to repeat the response, the vocations expert said, confusingly, "I said they probably couldn't."  Is that was -- that was my answer? . . . Yes.  Because during training, you're going to have more contact with the supervisors, and watching them more closely [sic]" (A.R. 60).  Thus, the vocational expert's testimony does not provide substantial evidence that a person limited to "minimal or superficial" contact with others (including supervisors) could perform any of the jobs identified.

On the current record, the Court is unable to deem the ALJ's errors to have been harmless.  See Treichler v. Commissioner, 775 F.3d 1090, 1105 (9th Cir. 2014) ("Where, as in this case, an ALJ makes a legal error, but the record is uncertain and ambiguous, the proper approach is to remand the case to the agency"); see also Molina v.

---

[4]   In social security terminology, "occasional" means "occurring from very little up to one-third of the time."  See Social Security Ruling 83-10.

Astrue, 674 F.3d 1104, 1115 (9th Cir. 2012) (an error "is harmless where it is inconsequential to the ultimate non-disability determination") (citations and quotations omitted); McLeod v. Astrue, 640 F.3d 881, 887 (9th Cir. 2011) (error not harmless where "the reviewing court can determine from the 'circumstances of the case' that further administrative review is needed to determine whether there was prejudice from the error").[5]

**III. Remand for Further Administrative Proceedings is Appropriate.**

Remand is appropriate because the circumstances of this case suggest that further administrative review could remedy the errors discussed herein. McLeod v. Astrue, 640 F.3d at 888; see also INS v. Ventura, 537 U.S. 12, 16 (2002) (upon reversal of an administrative determination, the proper course is remand for additional agency investigation or explanation, except in rare circumstances); Dominguez v. Colvin, 808 F.3d 403, 407 (9th Cir. 2015) ("Unless the district court concludes that further administrative proceedings would serve no useful purpose, it may not remand with a direction to provide benefits"); Treichler v. Commissioner, 775 F.3d at 1101 n.5 (remand for further administrative proceedings is the proper remedy "in all but the rarest cases"); Garrison v. Colvin, 759 F.3d at 1020 (court

---

[5] The initial and reconsideration disability determinations suggest that a person with the limitations the state agency physicians found to exist might be able to perform other work (see A.R. 73, 85-86 (referencing the grids)). However, no vocational expert testimony supports this suggestion. See A.R. 55-61; see also Moore v. Apfel, 216 F.3d 864, 870 (9th Cir. 2000) ("When a claimant suffers from both exertional and nonexertional limitations, the grids are only a framework and a [vocational expert] must be consulted.").

18

will credit-as-true medical opinion evidence only where, inter alia, "the record has been fully developed and further administrative proceedings would serve no useful purpose"); Harman v. Apfel, 211 F.3d 1172, 1180-81 (9th Cir.), cert. denied, 531 U.S. 1038 (2000) (remand for further proceedings rather than for the immediate payment of benefits is appropriate where there are "sufficient unanswered questions in the record"). There remain significant unanswered questions in the present record.

**CONCLUSION**

For all of the foregoing reasons,[6] Plaintiff's and Defendant's motions for summary judgment are denied and this matter is remanded for further administrative action consistent with this Opinion.

LET JUDGMENT BE ENTERED ACCORDINGLY.

DATED: September 16, 2019.

/s/
CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE

---

[6] The Court has not reached any other issue raised by Plaintiff except insofar as to determine that reversal with a directive for the immediate payment of benefits would not be appropriate at this time.